# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

PAUL E. COOK,

      Plaintiff,

v.

WARREN SCREW PRODUCTS, INC.,

      Defendant.

Court of Appeal No. 24-1192
District Case No. 22-cv-11494
District Judge Hon. Nancy G. Edmunds

| | |
|---|---|
| Carla D. Aikens (P69530)<br>Austen J. Shearouse (P84852)<br>CARLA D. AIKENS, P.L.C.<br>Attorneys for Plaintiff<br>615 Griswold St., Ste. 709<br>Detroit, MI 48226<br>(844) 835-2993<br>carla@aikenslawfirm.com | Courtney L. Nichols (P75160)<br>John S. Gilliam (P81421)<br>PLUNKETT COONEY<br>Attorneys for Defendant<br>38505 Woodward Ave., Ste. 100<br>Bloomfield Hills, MI 48304<br>(248) 901-4000<br>cnichols@plunkettcooney.com<br>jgilliam@plunkettcooney.com |

## APPELLANT PAUL COOK'S BRIEF ON APPEAL OF DISTRCIT COURT DECISION TO DISMISS PLAINTIFF'S COMPLAINT

\

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 24-1192          Case Name: Cook v. Warren Screw Products, Inc.

Name of counsel: Carla D. Aikens

Pursuant to 6th Cir. R. 26.1, Paul Cook

*Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

    Not applicable.

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

    No such institution exists.

### CERTIFICATE OF SERVICE

I certify that on _____ August 5, 2024 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Carla D. Aikens

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# <u>TABLE OF CONTENTS</u>

**INDEX OF AUTHORITIES** ................................................................. ii

**STATEMENT IN SUPPORT OF ORAL ARGUMENT** ................................ iii

**STATEMENT OF ISSUES** ................................................................. iii

**STATEMENT OFJURISDICTION** ........................................................ 4

**STATEMENT OF THE CASE** ............................................................. 5

**STANDARD OF REVIEW** ................................................................. 12

**SUMMARY OF THE ARGUMENT** ...................................................... 13

**LEGAL ARGUMENT** ...................................................................... 14

    **A. Plaintiff's Disability Discrimination Claims Are Properly Laid And Should Be Allowed To Proceed.** ........................................................ 14

    *i.   Plaintiff meets the standard for a disability.* ................................. 14

    *ii.  Plaintiff was qualified to perform the essential functions of his position with or without reasonable accommodation.* ............................................... 17

    *iii. Defendant had actual knowledge or should have known about Plaintiff's disability.* ....................................................................................... 19

    *iv. Defendant's proffered reason for Plaintiff's termination is purely pretextual.* 20

    **B. Plaintiff has Properly Presented his Failure to Accommodate Claim.** ..23

    **C. Plaintiff's Retaliation Claims do not Fail as a Matter of Law.** .............. 24

**CONCLUSION** ............................................................................... 25

CERTIFICATE OF COMPLIANCE ....................................................... 26

# <u>INDEX OF AUTHORITIES</u>

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)..............................................13

*Hoskins v. Oakland Cty. Sheriff's Dep't*, 227 F.3d 719 (6th Cir. 2000) .................18

*Hostettler v. College of Wooster,* 895 F. 3d 844 (6th Cir. 2018) ...........................18

*Hrdlicka v. General Motors*, LLC, 63 F.4th 555 (6th Cir. 2023)...........................14

*Kiphart v. Saturn Corp.*, 251 F.3d 573 (6th Cir. 2001) ...........................................17

*Milholland v. Sumner Cnty. Bd. Of Educ.*, 569 F.3d 562 (6th Cir. 2009) .. 15, 16, 19

*Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595 (6th Cir. 2018) ...................................................................................................................17

*Richmond v. Huq*, 885 F.3d 928 (6th Cir. 2018) ....................................................12

*Watson v. Cartee*, 817 F.3d 299 (6th Cir. 2016).....................................................12

*Whitfield v. Tennessee*, 639 F.3d 253 (6th Cir. 2011) ............................................14

*Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384 (6th Cir. 2017)...................14

## <u>STATEMENT IN SUPPORT OF ORAL ARGUMENT</u>

Appellant, Paul Cook, hereby makes his request for oral argument on this matter to assist in establishing the factual framework and support for Mr. Cook's employment claims. Both sides presented differences in what the facts of this case show during the briefing on Defendant's Motion for Summary Judgment. (ECF No. 16 PageID. 67)

## <u>STATEMENT OF ISSUES</u>

1. Whether Plaintiff can establish a prima facie case of discrimination?

   a. Plaintiff says:                    Yes.

   b. Defendant likely says:             No.

2. Whether Defendant proffered a legitimate non-discriminatory reason for terminating the Plaintiff that is not pretextual?

   a. Plaintiff says:                    No.

   b. Defendant likely says:             Yes.

3. Whether Plaintiff can establish a failure to accommodate claim?

   a. Plaintiff says:                    Yes.

   b. Defendant likely   says:           No.

4. Whether Plaintiff can establish his retaliation claims under the ADA and ELCRA?

   a. Plaintiff says:                    Yes.

   b. Defendant likely says:             No.

## <u>STATEMENT OFJURISDICTION</u>

This appeal originates from the dismissal of Plaintiff's Complaint before the district court under District Court Case No. 22-cv-11494. Plaintiff's Complaint, (ECF No. 1) established the jurisdiction of the district court under 42 U.S.C. § 12101 with supplemental jurisdiction of Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. Plaintiff's claims originate due to discrimination, retaliation, and other such treatment he received due to his disability. Defendant filed a Motion for Summary Judgment in this matter (ECF No. 16) with Plaintiff filing a response, (ECF No. 19) and Defendant filing a reply (ECF No. 21). On February 5, 2024, the district court entered an order (ECF No. 22) granting Defendant's Motion for Summary Judgment and issuing a judgment to reflect the same. (ECF No. 23).

Plaintiff submitted a Notice of Appeal on March 5, 2024 (ECF No. 24), with the Statement of Parties and Issues and Corporate Disclosure being filed on April 1, 2024. This complies with Fed. R. App. P. 3 and 4(a)(1)(A), as this judgment was a final order  dispensing of all of Plaintiff's claims in a civil matter allowing Plaintiff to appeal as a matter of right. An extended briefing schedule was set on July 23, 2024, establishing the due date for Plaintiff's appeal as August 5, 2024. [Doc. 18]

## **STATEMENT OF THE CASE**

Mr. Cook filed this instant Complaint against the Defendant alleging discrimination in violation of the Americans with Disabilities Act ("ADA") and the Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA") and retaliation in violation of the ADA as well as Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"). Defendant filed the instant Motion for Summary Judgment on May 19, 2023, and Plaintiff now offers this Response to the arguments presented in Defendant's Motion. Mr. Cook began his employment with WSP on or about September 20, 2021 as a delivery truck driver. (ECF No. 19-1 at PageID. 476). In that role, his responsibilities included local pickups, local drop-offs, inspecting parts, keeping the bay clean, weighing parts, pallet maintenance, and other such responsibilities "inside the plant." (ECF No. 18-2 at PageID. 507). From September 20, 2021 to September 25, 2021, Mr. Cook showed up to work in a timely manner and performed his tasks with no issue. (ECF No. 19-3 at PageID. 540).[1] He further showed up on Saturday, September 25, 2021, despite there being a miscommunication on the nature of Mr. Cook's role. (Exhibit B at 18-19).

---

[1] Ms. Jermanus testified that she never had to file a complaint against Mr. Cook for apathy or failing to complete the tasks required of his job. She further admitted Mr. Cook never complained about being handed a "shipper," which is an assigned drive for either a pickup or drop-off. *See id.*

```
6  Q.   What did Tom say about the hours you would be working?
7  A.   7:00 to 5:00, Monday through Friday; and occasionally
8       I'll work a Saturday.
```

(ECF No. 19-4 at PageID. 596). Tom Shelton, the materials manager and Mr. Cook's supervisor, was told by Mr. Cook that he "[did not] mind working a Saturday now and then." (*Id*.). Mr. Shelton's conversation on the required hours left Mr. Cook with the understanding that Saturdays would only be an occasional thing. (*Id*. at PageID. 597). In fact, Mr. Cook was only informed about the every Saturday requirement at 4:45 p.m. on Friday, September 24, 2021; only fifteen minutes before the end of Mr. Cook's workday.

```
2  Q.   And he told you he's going to need you to come in the
3       following day and every Saturday going forward?
4  A.   Well, what he told me, what I can remember, is that you
5       know you have to work every Saturday.  I said no, that's
6       not what you said.  You asked me how do I feel about
7       working on Saturdays, and I told him I don't mind
8       working a Saturday now and then.  He goes, that's not
9       what I told you; I said, that's not what you said.
```

(*Id*. at PageID. 597-98). This miscommunication did not cause Mr. Cook to refuse to work on a Saturday even with him being sick. (*Id*. at PageID. 598). Mr. Cook

reiterated multiple times that one of the reasons he took the job was the fact it was not a mandatory Saturday position. *Id*. at PageID. 605-606.[2]

Even though Mr. Shelton knew about Mr. Cook's sickness that had plagued him in the days prior, Mr. Shelton never asked Mr. Cook how he was feeling or what was going on with his health. (*Id*. at PageID. 607). His health issues persisting through the weekend caused Mr. Cook to call off Monday, September 27, 2021, and Tuesday, September 28, 2021, as he waited for his doctor's appointment on Wednesday, September 29, 2021. (*Id*. at PageID. 609-10).[3] This visit resulted in Mr. Cook receiving antibiotics and a note, that Defendant received via email, related to Mr. Cook's complaints. (*Id*. at PageID 602; s*ee also* Exhibit 6 to Defendant's Motion for Summary Judgment, ECF No. 16-7, PageID. 277). As Defendant's corporate representative noted in her deposition, this first note along with the second note submitted on October 4, 2021, "did not prevent him from

---

[2] Defendant attempts to say Mr. Shelton informed Mr. Cook that he would only be required to appear on some Saturdays. Mr. Shelton testified that every Saturday was a requirement in his deposition, and does not address any conversations prior to Plaintiff working, so Plaintiff assumes this statement is accepting Plaintiff's version of the conversations prior to his employment. (ECF No. 19-2 at PageID. 507).

[3] Mr. Cook left messages for both of the days he was sick, as required by Defendant. (*Id*. at PageID. 612).

working. It just said that he was being treated and I think that he could return to work." (ECF No. 19-1 at PageID. 478).[4]

Defendant admits it received both notes from Mr. Cook via email. (*See* Defendant's Motion for Summary Judgment, ECF No. 16, PageID. 82-83; *see also* ECF No. 16-7 Defendant's Exhibit 6: Second Doctor's Note from Mr. Cook). Ciara Kane, the Human Resources Manager for Defendant, received this information and sought to have Mr. Cook return to work early, in violation of his doctor's treatment plan. (ECF No. 19-1 at PageID. 479). Defendant does not have a policy requiring Ms. Kane to reach out to an employee under such a treatment plan. (*Id*.). Mr. Cook was never told as a part of the interview process that even if he submitted a doctor's note for a sickness, illness, or disability he would be required to return to work earlier than the medically recommended date. (*Id*.). In fact, the treatment of Mr. Cook by Defendant did not follow their typical treatment of their employees:

```
 8      Q    Have there been other individuals in the
 9   truck driver role that have been asked to return early
10   from sick leave?
11      A    There has not -- no one has ever been asked
12   to return early from sick leave.  There have been
13   other truck drivers in the role that have medical
14   conditions and we made accommodations in order to get
15   them back to work until they were completely healed
16   up.
```

---

[4] As discussed in the argument sections of this Response, this distinction is important as even Defendant's corporate representative realized Mr. Cook could work in some capacity. Defendant terminated Plaintiff during a treatment plan to get his issues under control and now claims he could not perform the essential functions of his position with accommodation.

(*Id*. at PageID. 480). Oddly enough, Mr. Cook's direct supervisor, Mr. Shelton, could not recall another instance of an employee of Defendant having their employment status altered while covered under a valid doctor's note. (ECF No. 19-2 at PageID. 514). Mr. Shelton further admitted that if Mr. Cook submitted a doctor's note stating he could return to work on October 11, 2021, it would have signaled to Mr. Shelton that Mr. Cook was still interested in the position. (*Id*.). However, Mr. Shelton did not receive the second doctor's note because he told Mr. Cook that Ciara Kane would be handling the issue. (*Id*. at PageID. 505, 506, 508, 509, 509-510[5]; *see also id*. at PageID. 511 ("Please maintain future updates with Ciara.")).

Shortly after submitting the second doctor's note, Ms. Kane asked for the company keys and truck card back ASAP so that job duties could be completed in an email on October 5, 2021. (*See* Exhibit 10 to Defendant's Motion for Summary Judgment, ECF No. 16-11, PageID. 358). That email chain further threatens the security of Mr. Cook's job security when he asks about his employment status and Ms. Cane responded:

> We are working to determine how to move forward now. A final decision has not been made regarding your employment status. We are

---

[5] Mr. Shelton described the process surrounding this incident as him "dropp[ing] [Mr. Cook] off to Ciara" and telling him to "keep everything with her." (ECF No. 19-2 at PageID 510).

requesting the company property in order to continue business operations while we come to a decision.

(*Id*. at PageID. 357). This response came only **one day** after Mr. Cook submitted his second doctor's note that Defendant saw as legitimate. (ECF No. 19-1 at PageID. 478, 482).[6] Mr. Cook, adhered to his doctor's orders, and in an effort to assist Defendant with its operations left the only set of keys to the company truck in the desk along with the gas card. (*Id*. at PageID 481; s*ee also* ECF No. 19-4 at PageID. at 692).[7]

```
 4    Q    Is that the only truck that Warren has to
 5  use for these types of deliveries?
 6    A    It's the only company truck; yes.
 7    Q    So, if somebody else -- another employee
 8  from Warren -- wanted to make a company run in a
 9  company truck, that is the only truck that is a Warren
10  company truck?
11    A    That is a Warren company truck; yes.
12    Q    So, if Mr. Cook took the keys home with him,
13  would there be another way to use that truck?
14    A    There would not -- not, no.
```

(ECF No. 19-1 at PageID. 481). Defendant used this along with alleged "tone" in conversations and "unreliability" to extrapolate the idea that Mr. Cook was

---

[6] Defendant's corporate representative testified that no calls were ever made questioning the validity of the notes Mr. Cook provided.

[7] Mr. Cook does not recall being instructed to hold on to the keys and card, as Mr. Shelton stated Mr. Cook could keep them if he wanted. Mr. Cook responded with concerns about keeping the property on him in case of an accident as there was not a reason to keep them. (*See id*. at PageID 692-93).

abandoning his job. (*Id*. at PageID. 481-82). However, Defendant cannot point to a day Mr. Cook violated Defendant's policies in either calling off work or providing documentation about his work status. Defendant's own corporate representative admitted Mr. Cook never stated or said anything to directly support their idea that he was abandoning his job. *Id*. Mr. Shelton admitted that it was a *practice*, not a policy, of the prior driver to keep the keys and card on him. (ECF No. 19-2 at PageID. B at 506). Curiously, Mr. Shelton looked in the drawer prior to asking Ms. Kane to contact Mr. Cook about the keys. *Id*.

> 22    Q    And did someone at some point in time ask
> 23  for the keys back from Mr. Cook?
> 24    A    Yes.  I -- yeah.  Ciara -- I had -- I asked
> 25  Ciara to text him or contact him.  And ask him where
>                                                    Page 14
>
> 1  the keys were.
> 2    Q    And what was the purpose for having Ciara
> 3  send that text or call?
> 4    A    'Cause I didn't want to talk to him.
> 5  Basically.  I just wanted to know where the keys were
> 6  to my truck.  I -- I looked in the truck.  I -- I
> 7  looked in the truck.  I thought I looked in the drawer
> 8  but.  Either way, but.  I needed -- I needed the
> 9  second set of keys.  That's all it is.

This statement clearly shows that Mr. Shelton looked or at least thought about looking in the drawer for the keys and gas card prior to asking Ms. Kane to reach out to Mr. Cook. *Id*. This supports Plaintiff's contention that Mr. Shelton either instructed or knew about the location of the keys prior to asking Ms. Kane. *Id*. (*See also* ECF No. 19-4 at PageID. 692-693). Defendant's Motion states this situation

"signaled to the Company that Plaintiff had no intention of ever coming back and had abandoned his employment while trying to continue to obtain a paycheck. **Ex. 9**, p. 43." *See* Defendant's Motion for Summary Judgment, ECF No. 16, PageID. 85.[8]

However, Defendant does not dispute that Mr. Cook remained in regular communication with Defendant about his status and condition. As mentioned before, Mr. Shelton, Mr. Cook's direct supervisor, admitted that a doctor's note would have indicated an intention to continue working. (ECF No. 19-2 at PageID. 514). Defendant terminated Mr. Cook before his return-to-work date, giving him no chance to adhere to the doctor's note provided to Defendant. (ECF No. 19-1 at PageID. 482).

## STANDARD OF REVIEW

This Honorable Court reviews a district court's grant of summary judgment *de novo*. *Watson v. Cartee*, 817 F.3d 299, 302 (6th Cir. 2016). Summary judgment is appropriate only if there is "no genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law. *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). "A genuine issue of material fact exists where 'the evidence is such that a reasonable jury could return

---

[8] Plaintiff is unable to adequately respond to that factual contention as Page 43, in the record as ECF No. 19-1 at PageID 481, of Ms. Kane's deposition makes no mention of a paycheck nor does it express any direct sentiments about Plaintiff's intention, to the extent Defendant would know even be able to ascertain the same.

a verdict for the nonmoving party.'" *Id*. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "In determining 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law,' this [c]ourt must view all of the evidence and draw all reasonable inferences in the light most favorable to the non-moving party." *Id*. (quoting *Anderson*, 477 U.S. at 251–52).

## <u>SUMMARY OF THE ARGUMENT</u>

Appellant's argument is that the record supports his contention of the Defendant-Appellee's lack of proper reasoning for Mr. Cook's termination. The argument attacks each element necessary for Mr. Cook to succeed on his claims with Plaintiff showing how the proffered reason for the termination lacks a secure foundation to accept it as uncontroverted fact. All of the various claims (disability discrimination, failure to accommodate, and retaliation) all draw support from similar factual bases such as the submission of doctor's notes, the testimony of Defendant's representative, as well as Mr. Cook's direct supervisor. Ultimately, Mr. Cook submits that the district court did not properly construe the evidence in a light most favorable to his case when making its ruling on Defendant's Motion for Summary Judgment (ECF No. 16), which it was required to do.

## <u>LEGAL ARGUMENT</u>

### A. Plaintiff's Disability Discrimination Claims Are Properly Laid And Should Be Allowed To Proceed.

To establish a prima facie case, an employee must demonstrate that: (1) he has a disability, (2) he is otherwise qualified for the job "with or without reasonable accommodation," (3) he "suffered an adverse employment decision," (4) his employer "knew or had reason to know" of his disability, and (5) his position remained open, or he was replaced. *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 395 (6th Cir. 2017) (quoting *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011)). Upon that showing, the burden then shifts to the defendant to "demonstrate that there was a legitimate, nondiscriminatory reason for the adverse employment action." *Id*. (citing *Whitfield*, 639 F.3d at 259). The burden then shifts back to the employee to show that the purported nondiscriminatory reason "was actually a pretext designed to mask discrimination." *Id*  (citing *Whitfield*, 639 F.3d at 259).

### 1.  *Plaintiff meets the standard for a disability.*

In Section (I)(C) of its Motion, Defendant cited *Hrdlicka v. General Motors, LLC*, 63 F.4th 555 (6th Cir. 2023), to support that he was not disabled. However, that case has an important factual distinction that separates it from the case at issue: the plaintiff in *Hrdlicka* "never even sought medical help for any symptoms or conditions from which she was suffering while employed." *Hrdlicka*, 63 F.4th at

567.[9] Comparing the two situations would not be proper as it is undisputed in the record that Mr. Cook not only sought treatment but sent two doctor's notes to Defendant which informed them of the seriousness of his issues. At the very least, this evidence presents a question of fact as to whether he had a disability.

Defendant also cited *Milholland v. Sumner Cnty. Bd. Of Educ.*, 569 F.3d 562 (6th Cir. 2009) in the same section to address the "regarded as" disabled framework. (*See* Defendant's Motion, ECF No. 16, PageID. 93). However, there are important factual distinctions that do not make a direct factual comparison proper to the issue at hand, as well as the fact that the *Milholland* opinion was centered around a prior version of the ADA. In *Milholland*, the plaintiff complained about not receiving an administrator position upon her transfer from the school with which she was then-currently employed. 569 F.3d at 565. The position she did receive was a teaching position, which the appellate panel held was in the similar class of positions as an administrative position. *Id*. The plaintiff's supervisor "found out about Milholland's illness when Milholland's husband worked with Bills at the same school, prior to the time when Bills supervised Milholland. Thereafter, Bills inquired about Milholland's health at social events." *Id*. at 567 (6th Cir. 2009). Further, the appellate court noted the

---

[9] The Court in *Hrdlicka* mentioned that the text messages and comments were not enough and pointed to the lack of medical treatment as an indicator of the lack of notice to the defendant. Mr. Cook did seek treatment in addition to sending texts and making comments.

defendant clearly did not regard the plaintiff as disabled, because the job duties defendant assigned to plaintiff, in her pre-transfer role, "might have been difficult with her illness." *Id*. at 568.[10]

The defendant's actions, not its words, was determinative of whether or not it regarded the plaintiff as disabled. *See id*. at 568. Here, Defendant's actions counter the alleged statements made, as a reasonable juror could determine Defendant regarded Mr. Cook as disabled. Unlike the defendant in *Milholland*, Defendant recognized Mr. Cook as disabled as evidenced by the subpar "attempt" to accommodate him.[11] Ms. Kane testified that a single phone call was made to Mr. Cook asking him to come in for some reduced hours, despite a doctor's note setting a clear return to work date. (ECF No. 19-1 at PageID at 479, 482). Ms. Kane's offer, while ineffective as an accommodation, clearly shows Defendant did in fact regard Mr. Cook's condition with a seriousness that was not shown in *Hrdlicka* or *Milholland*. Unlike the plaintiff in *Hrdlicka*, Mr. Cook sought out medical treatment multiple times and provided records to Defendant, evidencing said treatment. Unlike the defendant in *Milholland*, Defendant made an attempt, while inadequate, to alter the schedule of Mr. Cook; this would clearly call into question

---

[10] The plaintiff complained of arthritis and was being assigned to mop floors, clean bathrooms, paint restrooms, and serve lunch while in her pre-transfer role. *Id*. at 568.

[11] The defendant in *Milholland* did not take any action remotely similar to this.

Defendant's statements that i did not regard him as disabled under the *Milholland* framework.

Plaintiff's situation mirrors that of the plaintiff in the Ninth Circuit opinion of *Shields v. Credit One Bank, NA,* 32 F. 4th 1218 (9th Cir. 2022), where the plaintiff was fired while on a "second note" from a doctor, similar to Plaintiff here. The Ninth Circuit reversed the district court's dismissal of the claim, finding that even a temporary, serious disability could constitute a disability under the ADA. Similarly, this Court should find that Plaintiff had a disability, or that Defendant regarded Plaintiff as having a disability, for which it believed he would miss substantial work and not be able to work. There would be no reasonable basis to not give him an additional five days off when it would take at least that much time to find another employee, unless Defendant believed that he would continue to be out for more time.

> 2. *Plaintiff was qualified to perform the essential functions of his position with or without reasonable accommodation.*

"A job function is essential if its removal would fundamentally alter the position." *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603 (6th Cir. 2018)(quoting *Kiphart v. Saturn Corp.*, 251 F.3d 573, 584 (6th Cir. 2001)) This analysis does not lend itself to strict rules—it is "highly fact specific." *Mosby-Meachem*,883 F.3d at 605(quoting *Hoskins v. Oakland Cty. Sheriff's Dep't*,

227 F.3d 719, 726 (6th Cir. 2000)). [C]ourts must perform a fact-intensive analysis. As this court has said:

> In determining what functions are essential, courts may consider as evidence — among other things — the amount of time spent on a particular function; the employer's judgment; "written job descriptions prepared before advertising or interviewing" for the position; and the consequences of not requiring the employee to perform the particular function. 29 C.F.R. § 1630.2(n)(3). Although the employer's judgment receives some weight in this analysis, see *Williams v. AT&T Mobility Servs*., 847 F.3d 384, 391-92 (6th Cir. 2017), it is not the end-all — especially when an employee puts forth competing evidence. *See id*. at 393. After all, the burden of making out a prima facie case is not an onerous one. *See, e.g., Ferrari* [*v. Ford Motor Co*., 826 F.3d 885, 894 (6th Cir. 2016)].

*Hostettler v. College of Wooster,* 895 F. 3d 844, 854-55 (6th Cir. 2018). Defendant's argument in Section (I)(E) of its motion (ECF No. 16 at PageID 94-95), focused on the daily deliveries portion of his job; however, Mr. Shelton testified that was not the only essential or required part of the job. Attendance, local pickups, local drop-offs, inspecting parts, keeping the bay clean, weighing parts, pallet maintenance, and other such responsibilities "inside the plant" that were essential to Mr. Cook's position. (ECF No. 19-2 at PageID 506, 512). In fact, Mr. Cook's Saturday work did not involve deliveries. (*Id*. at PageID 506). Simply put, Mr. Cook's position had several responsibilities and many of those could have

been performed by the Plaintiff even with his disability as shown by the success of his Saturday in the office. *Id.*

### 3. Defendant had actual knowledge or should have known about Plaintiff's disability.

The defendant's actions, not their words, were determinative of whether or not they regarded the plaintiff as disabled. *See Milholland*, at 568. Here, Defendant's actions counter the alleged statements made, as a reasonable juror could determine Defendant regarded Mr. Cook as disabled. Unlike the defendant in *Milholland*, Defendant recognized Mr. Cook as disabled as evidenced by the subpar "attempt" to accommodate him.  Ms. Kane testified that a single phone call was made to Mr. Cook asking him to come in for some reduced hours despite a doctor's note setting a clear return to work date. (ECF No. 19-1 at PageID. 479, 482). Ms. Kane's offer, while ineffective as an accommodation, clearly shows Defendant did in fact regard Mr. Cook's condition with a seriousness that was not shown in *Hrdlicka* or *Milholland*. Unlike the plaintiff in *Hrdlicka*, Mr. Cook sought out medical treatment multiple times and provided records to Defendant evidencing said treatment. Unlike the defendant in *Milholland*, Defendant made an attempt, while inadequate, to alter the schedule of Mr. Cook; this would clearly call into question Defendant's statements that it did not regard him as disabled under the *Milholland* framework. Mr. Cook did everything necessary to gather

information on his issues and presented Defendant with two separate notes that
detailed, at the bare minimum, a treatment plan for his issues.

**B. Defendant's Proffered Reason For Plaintiff's Termination Is Purely Pretextual.**

Defendant relies entirely on the keys and gas card as the basis for
termination of Mr. Cook during the time he was covered by his second doctor's
note. Mr. Cook adhered to his doctor's orders, and in an effort to assist Defendant
with its operations, left the only set of keys to the company truck in the desk along
with the gas card. (*See* ECF No. 19-4 at PageID. 692).[12]

```
 4    Q   Is that the only truck that Warren has to
 5  use for these types of deliveries?
 6    A   It's the only company truck; yes.
 7    Q   So, if somebody else -- another employee
 8  from Warren -- wanted to make a company run in a
 9  company truck, that is the only truck that is a Warren
10  company truck?
11    A   That is a Warren company truck; yes.
12    Q   So, if Mr. Cook took the keys home with him,
13  would there be another way to use that truck?
14    A   There would not -- not, no.
```

(ECF No. 19-1 at PageID. 481). Defendant used this along with alleged "tone" in
conversations and "unreliability" to extrapolate the idea the Mr. Cook was

---

[12] Mr. Cook does not recall being instructed to hold on to the keys and card as Mr.
Shelton stated Mr. Cook could keep them if he wanted. Mr. Cook responded with
concerns about keeping the property on him in case of an accident as there was not
a reason to keep them. (*See id*. at PageID. 692-93).

abandoning his job. (*Id*. at PageID. 481-482). However, Defendant cannot point to a day Mr. Cook violated Defendant's policies in either calling off work or providing documentation about his work status. Defendant's own corporate representative admitted Mr. Cook never stated or said anything to directly support their idea that he was abandoning his job. *Id*. Mr. Shelton admitted that it was a practice of the prior driver, not a policy of the company, to keep the keys and card on him. (ECF No. 19-2 at PageID. 506). Curiously, Mr. Shelton looked in the drawer prior to asking Ms. Kane to contact Mr. Cook about the keys. (*Id*.).

> 22    Q    And did someone at some point in time ask
> 23 for the keys back from Mr. Cook?
> 24    A    Yes.  I -- yeah.  Ciara -- I had -- I asked
> 25 Ciara to text him or contact him.  And ask him where
>                                                    Page 14
>
> 1 the keys were.
> 2    Q    And what was the purpose for having Ciara
> 3 send that text or call?
> 4    A    'Cause I didn't want to talk to him.
> 5 Basically.  I just wanted to know where the keys were
> 6 to my truck.  I -- I looked in the truck.  I -- I
> 7 looked in the truck.  I thought I looked in the drawer
> 8 but.  Either way, but.  I needed -- I needed the
> 9 second set of keys.  That's all it is.

This statement clearly shows that Mr. Shelton looked or at least thought about looking in the drawer for the keys and gas card prior to asking Ms. Kane to reach out to Mr. Cook. *Id*. This supports Plaintiff's contention that Mr. Shelton either instructed or knew about the location of the keys prior to asking Ms. Kane. (*Id*.); *see also* ECF No. 19-4 at PageID. 692-93)). Defendant's Motion states this

situation "signaled to the Company that Plaintiff had no intention of ever coming back and had abandoned his employment while trying to continue to obtain a paycheck. **Ex. 9**, p. 43." (*See* Defendant's Motion for Summary Judgment, ECF No. 16, PageID. 85).[13]

However, Defendant does not dispute that Mr. Cook remained in regular communication with Defendant about his status and condition. As mentioned before, Mr. Shelton, Mr. Cook's direct supervisor, admitted that a doctor's note would have indicated an intention to continue working. (ECF No. 19-2 at PageID. 514). The reason is not sufficient and supports pretext, as no policy exists rendering Mr. Cook's action an immediately terminable offense. A reasonable juror could determine that the inconsistency of Mr. Shelton's timeline, the haste in which Mr. Cook was terminated, the fact Mr. Cook was terminated while covered by a doctor's note, Mr. Shelton's admission that it was a practice, not a policy, that drivers would keep the keys and card, and that Defendant's corporate representative testified to there being only one set for the only company delivery truck, show Defendant's offered reason is not legitimate.

Finally, as noted above, it is not reasonable for Defendant to have fired Plaintiff just before he was scheduled to return, unless it did not believe he was

---

[13] Defendant did not properly support this contention, found at ECF No. 19-1 at PageID. 481, as the cited portion of Ms. Kane's deposition makes no mention of a paycheck nor does it express and direct sentiments about Plaintiff's intention.

going to be able to return to work. It very clearly terminated him for being out of work, and its motion should be denied.

### C. Plaintiff has Properly Presented his Failure to Accommodate Claim.

Plaintiff incorporates his discussion on the existence of disability from the preceding paragraphs as if fully restated herein. To address the arguments under this section, Mr. Cook points to the factors listed on page 22 of Defendant's Motion. (ECF No. 16 at PageID. 88). Plaintiff was disabled within the meaning of the act as discussed above, he was qualified for the position with or without a reasonable accommodation, Defendant clearly knew of his disability from the actions they took, he did in fact request an accommodation when he provided two separate doctor's notes, and Defendant failed to provide said requested accommodation.

Defendant's argument presented to the district court in this section is based on hindsight rather than what Defendant and its employees actually knew or should have known at the time of the issues in Plaintiff's Complaint. (ECF No. 1). Plaintiff sent two different doctor's notes that listed a return-to-work date. That fact is beyond dispute and admitted by Defendant in its Motion. Both of these requests for a return-to-work date, in accordance with his doctor's evaluation – after two weeks – operated as a request for accommodation. The accommodation was simply to allow Plaintiff time to recover and then address any lasting issues

going forward. However, rather than allow that, Defendant fired him for attempting to seek that accommodation. Defendant terminated Mr. Cook on October 8, 2021, when his return-to-work date was slated for October 11, 2021. Given that October 8, 2021 was a Friday, Mr. Cook was terminated with only one day left on the accommodation he had requested. There would not have been any additional "cost" or "expense" to Defendant to give Mr. Cook the chance to return on October 11, 2021 instead of terminating him on October 8, 2021 when the only working day between those dates would have been a Saturday, October 9, 2021.

Defendant failed to accommodate Plaintiff in his request via doctor's notes or offer a modified responsibility list, such as cleaning the bays, checking parts, and the like, which have already been shown to fall within his job responsibilities.

**D. Plaintiff's Retaliation Claims Do Not Fail as a Matter of Law.**

Plaintiff did engage in a protected activity when he sought to take time to recover from being sick and provided doctor's notes to support his request. This activity was clearly known to Defendant, as its Motion admits that HR received copies of the notes at issue. Defendant terminated Mr. Cook, which is the adverse action, and it is temporally connected due to the events taking place less than two (2) weeks apart. Mr. Cook was retaliated against for being sick and having the "gall" to request time to recover. This assertion of rights is the protected activity and Defendant clearly knew about said protected activity.

Lastly, Plaintiff has addressed why the "legitimate, non-discriminatory" reason for Plaintiff's termination holds no weight. Plaintiff was treated differently than other employees and was terminated improperly as shown by: 1) being asked to return to work early despite his request for an accommodation via doctor's note; 2) the gas card and keys being kept in the possession of the driver was a practice the prior driver engaged in and was not Defendant's policy; 3) Mr. Shelton, Mr. Cook's direct supervisor, admitted that a doctor's note would have indicated an intention to continue working; 4) the inconsistency of Mr. Shelton's testimony regarding whether he told Mr. Cook to place the keys and card in the desk; 5) the haste with which Mr. Cook was terminated despite the fact that he was just hired; and 5) Defendant's corporate representative testifying to there being only one set of keys for the only company delivery truck, all show Defendant's proffered reason for termination was not legitimate.

## **CONCLUSION**

WHEREFORE, Plaintiff, Paul E. Cook, requests the is Honorable Court enter an order vacating the district court's order granting Defendant's Motion for Summary Judgment, remand the matter back to the district court, and such other relief as deemed necessary and appropriate.

Dated: August 5, 2024                         Respectfully submitted,

                                              /s/ *Carla D. Aikens*
                                              CARLA D. AIKENS, P.L.C.
                                              Carla D. Aikens (P69530)
                                              *Attorneys for Plaintiff*
                                              615 Griswold Street, Suite 709
                                              Detroit, Michigan 48226
                                              Tel: (844) 835-2993
                                              Fax: (877) 454-1680



                                              Tel: (844) 835-2993
                                              Fax: (877) 454-1680

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limit of Federal Rule of Appellate

Procedure 32(a)(7)(B) because it contains 4,943, excluding the parts of the brief

exempted by Federal Rule of Appellate Procedure 32(f).

Dated: August 5, 2024                         Respectfully submitted,

                                              /s/ *Carla D. Aikens*
                                              CARLA D. AIKENS, P.L.C.
                                              Carla D. Aikens (6296269)
                                              *Attorneys for Plaintiff*
                                              615 Griswold Street, Suite 709
                                              Detroit, Michigan 48226
                                              Tel: (844) 835-2993
                                              Fax: (877) 454-1680

## **PROOF OF SERVICE**

On the date below, the undersigned certifies that a copy of the foregoing instrument was served upon all interested parties in the captioned matter via the Court's e-service system at the email addresses provided by said parties to the Court.

Dated: August 5, 2024

/s/ Carla D. Aikens